George Torgun (Bar No. 222085)
SAN FRANCISCO BAYKEEPER
785 Market Street, Suite 850
San Francisco, California 94103
Telephone: (415) 856-0444
Facsimile: (415) 856-0443
Email: george@baykeeper.org

Attorney for Plaintiff
SAN FRANCISCO BAYKEEPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a non-profit corporation,<br><br>      Plaintiff,<br>  v.<br>SYAR INDUSTRIES, INC.,<br><br>      Defendant. | Civil No. C 14-00779 JD<br><br>**REQUEST FOR ENTRY OF [PROPOSED] CONSENT DECREE AND DISMISSAL; [PROPOSED] ORDER**<br><br>Hon. James Donato |

   WHEREAS, on November 3, 2014, Plaintiff San Francisco Baykeeper ("Baykeeper") notified the Court that Baykeeper and Defendant Syar Industries, Inc. ("Syar") (collectively, the "Parties") had reached a tentative settlement in this action and had sent a copy of the [Proposed] Consent Decree to the U.S. Department of Justice and to the U.S. Environmental Protection Agency for a mandatory 45-day review period under 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.5, *see* Dkt. No. 19;

   WHEREAS, on December 18, 2014, the U.S. Department of Justice notified the Court and the Parties that it did not object to the entry of the [Proposed] Consent Decree, *see* Dkt. No. 21;

WHEREFORE, Baykeeper hereby requests that the Court approve and enter the [Proposed] Consent Decree as an Order of the Court, retain jurisdiction over this action for the sole purpose of enforcing compliance by the Parties with the terms of the [Proposed] Consent Decree, and order that the above-captioned action against Defendant be dismissed with prejudice;

WHEREFORE, Plaintiff respectfully requests the Court to approve and enter the [Proposed] Order attached hereto.

Dated:  December 22, 2014                              Respectfully Submitted,


                                                       /s/ George Torgun
                                                       _____
                                                       George Torgun
                                                       Attorney for Plaintiff
                                                       SAN FRANCISCO BAYKEEPER

**[PROPOSED] ORDER**

IT IS HEREBY ORDERED that the [Proposed] Consent Decree, attached hereto as Exhibit A, is fully incorporated herein by reference and is entered as an Order of the Court.

IT IS FURTHER ORDERED that the Court shall retain jurisdiction over Case No. C 14-00779 for the sole purpose of enforcing compliance by the Plaintiff and Defendant with the terms of the [Proposed] Consent Decree.

IT IS FURTHER ORDERED that the above-captioned action against Defendant is dismissed with prejudice.

IT IS SO ORDERED.

NORTHERN DISTRICT OF CALIFORNIA

Dated: January 12, 2015        _____

Hon. James Donato
United States District Judge



Exhibit A

**CONSENT DECREE**

WHEREAS, San Francisco Baykeeper, Inc. ("Baykeeper") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay and other area waters;

WHEREAS, Syar Industries, Inc. ("Syar") operates a rock quarry located at 2301 Napa Vallejo Highway in Napa, California (the "Facility");

WHEREAS, Baykeeper and Syar are collectively referred to herein as the "Parties";

WHEREAS, stormwater discharges associated with industrial activity at the Facility are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 92-12-DWQ (as amended by Water Quality Order 97-03-DWQ), and any future iterations of this permit, which are issued pursuant to Section 402 of the Federal Water Pollution Control Act, 33 U.S.C. § 1342 (hereinafter "Industrial Stormwater Permit").  These industrial activities include, *inter alia*, drilling and blasting of rock, processing and transporting rock and other aggregates, transportation of materials on and off site, storage of rock and aggregate materials, truck and equipment operation, and other industrial activities related to the operation of a rock quarry;

WHEREAS, the Industrial Stormwater Permit includes the following requirements for permittees:  1) develop and implement a stormwater pollution prevention plan ("SWPPP"), 2) control pollutant discharges using best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") to prevent or reduce pollutants, 3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP, and, 4) when

necessary, implement additional BMPs to prevent or reduce any pollutants that are causing or contributing to any exceedance of water quality standards;

WHEREAS, via letter dated December 2, 2013, Baykeeper served Syar, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of the Regional Board, and the U.S. Attorney General with a notice of intent to file suit ("60-Day Notice") under Sections 505(a)(1) and (f) of the Federal Water Pollution Control Act ("Clean Water Act" or "the Act"), 33 U.S.C. § 1365(b)(1)(A), alleging violations of the Act and the Industrial Stormwater Permit at the Facility;

WHEREAS, Baykeeper initiated a lawsuit against Syar in the United States District Court, Northern District of California, Case No. C 14-00779 JD ("Complaint");

WHEREAS, the Parties believe it is in their mutual interest and choose to resolve in full Baykeeper's allegations in the 60-Day Notice and Complaint through settlement and avoid the cost and uncertainties of further litigation;

NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:

**I.    COMMITMENTS OF SYAR**

1.    In order to further reduce or further prevent pollutants associated with industrial activity from discharging via stormwater to the waters of the United States, Syar shall implement appropriate structural and non-structural Best Management Practices ("BMPs"), as required by the Industrial Stormwater Permit, as described more fully below.

2.    **Site Map**:  Within thirty (30) days of the Effective Date, Syar shall update the Site Map included in the Facility SWPPP.  The Site Map shall clearly denote the direction of

stormwater flow for each distinct area of the Facility.  The Site Map shall also identify property boundaries, known or suspected drop inlets, ground type (pervious or impervious), any permanent structures and features, discharge points, and all other physical structures or items relevant under the Industrial Stormwater Permit and in this Consent Decree.

3.    **Designation and Protocol for All Sampling Locations**:  Within sixty (60) days of the Effective Date, Syar shall update the Facility SWPPP to fully describe any modifications to the discharge or sampling locations, as shown on the Site Map and described in the SWPPP ("Designated Discharge Point").  While the Consent Decree is in effect, if Syar makes any material changes to the Designated Discharge Points at the Facility, Syar shall update the SWPPP within sixty (60) days and submit the revised SWPPP to Baykeeper, consistent with the requirements of Paragraph 10, below.

4.    **Best Management Practices**:  Syar shall develop and implement BMPs necessary to, at a minimum, comply with Effluent Limitation B(3) and Receiving Water Limitation C(2) of the Industrial Stormwater Permit, including the BMPs set forth in Paragraphs 5 through 9 of this Consent Decree.

5.    **Storm Drain Inlet/Catch Basin Best Management Practices**:

   a.    Storm Drain Inlet/Designated Discharge Point Inspections:  Between September 1 and October 1 of each year, Syar shall inspect any storm drain inlets, catch basins, Designated Discharge Points, filtration/treatment devices, sedimentation ponds, stand pipes, and other BMPs in place at the Facility.  Syar shall promptly clean, as needed, each drain inlet, catch basin, Designated Discharge Point, filtration/treatment device, sedimentation pond, stand pipe, and other BMPs in order to remove any accumulated dust, sediment, solids, or debris.

3

b.      Storm Drain Inlet/Designated Discharge Point Maintenance and Cleaning: Monthly during the Wet Season (*i.e.*, from October 1 to May 30 of each year that this Consent Decree is in effect) ("Wet Season"), Syar shall inspect all storm drain inlets, catch basins, Designated Discharge Points, filtration/treatment devices, sedimentation ponds, and other BMPs in place at the Facility to ensure that they are not in a condition that would materially impair their efficacy and shall clean out accessible deposited sediment or debris if needed.  Syar shall properly dispose of any dust, sediment, debris, or other removed pollutants.

c.      Log of Storm Drain Inlet/Designated Discharge Point Inspections, Maintenance and Cleaning:  Syar shall prepare and maintain a log of the Storm Drain Inlet/Designated Discharge Point Inspections, Maintenance and Cleaning described herein ("Maintenance Log").  The Maintenance Log shall indicate the staff who completed the maintenance/cleaning activity and when it was completed.  The Log shall be made available for inspection by Baykeeper at any site inspection or otherwise within five (5) business days of any advance request by Baykeeper.

6.      **Vehicle and Equipment Management**:  Beginning on the Effective Date, Syar shall continue to implement BMPs to reduce or minimize pollutant release from equipment such as forklifts, hydraulic lifts, trucks, and other heavy equipment that are parked or stored in areas of the Facility from which stormwater discharges.  Such BMPs shall include placing drip pans under equipment stored or parked continuously for a week or longer, weekly inspections for evidence of leaks from such equipment, and prompt (as soon as reasonably possible and in no case later than in advance of forecasted rainfall events) clean up of spills, drips, or leaks from

4

such equipment.  Any spilled substances and absorbent materials used in cleaning up spills shall be disposed of in accordance with all local, state, and federal laws and regulations.

       7.    **BMPs at Specific Discharge Points**:  Syar shall implement the following BMPs at each discharge point (see Exhibit 1) by October 1, 2014, except as otherwise specified below:

       a.   Discharge Point A:  Improve the spillway areas between the ponds to address potential erosion.  Install a greater number of check dams, at approximately 30 foot intervals, and/or add gravel to the pond access roads and surrounding roads to reduce erosion.  Improve sediment management activities within the catchment area through enhanced use of wattles, revegetation, and check dams.

       b.   Discharge Point B:  Remove scrap metal, trash, debris, and unused equipment in the vicinity of this discharge point and along the adjacent creek.  Perform maintenance around the pond, including removing accumulated debris and revegetating areas of bare dirt, to improve pond functionality.

       c.   Discharge Point C-2:  Conduct an investigation of the catchment area and identify industrial contributions to stormwater pollution during the 2014-15 Wet Season, including a detailed map of the drainage area and photos of any disturbed areas. Following the investigation, propose BMPs to address these pollution sources that Syar will implement prior to the 2015-16 Wet Season.

       d.   Discharge Point D:  Install a filter sock or bag to filter stormwater prior to discharge from point D.  Install additional filtration berms and wattles upstream of and adjacent to the settling pond upstream of discharge point D.

       e.   Discharge Point E:  Conduct an inspection of the hillside adjacent to the settling pond and address potential erosion by using erosion control mats, hydroseeding, or

increased amounts of hay.  Install a new pond in the Snake Canyon area to collect additional stormwater runoff.

      f.   Discharge Point F:  Regularly inspect equipment storage area and implement appropriate BMPs to address potential pollutants from stored equipment, such as covering equipment, employing drip pans under equipment with oil absorbent pads, and draining fluids from equipment when practical.  On or before September 1st of each year, review the equipment storage area and identify equipment which is no longer needed and remove identified equipment by October 1.

      8.    **Training**:  Beginning on the Effective Date, and annually thereafter, and within thirty (30) days of the starting date for new employees, Syar shall conduct training for all appropriate employees to explain the requirements of the Facility's SWPPP to the extent applicable to such employee.  Training shall focus on 1) the employee's role in implementing various stormwater control measures including, for example, implementation of BMPs, vehicle maintenance, or facility inspections, and 2) strategies for reducing the release of pollutants that could reach stormwater during rain events.  Training shall be conducted bilingually (*i.e.,* Spanish/English or other pertinent language) to the extent that such employee is not reasonably able to comprehend training in English.  If and when appropriate, Syar shall integrate any new training requirements resulting from this Consent Decree into the Facility SWPPP.  Syar shall also update the SWPPP, if and when appropriate, to identify the positions responsible for carrying out stormwater management, monitoring, sampling, and SWPPP implementation.

      9.    **Maintenance of BMP Structural Controls**:  Beginning on the Effective Date, Syar shall maintain the structural BMPs at the Facility in good operating condition and shall promptly repair any damaged or degraded structural BMPs.

10.     **Initial Amendment of SWPPP**:  Within sixty (60) days of the Effective Date, Syar shall amend and provide to Baykeeper the Facility SWPPP to incorporate the requirements and BMPs set forth in Paragraphs 5 through 9 of this Consent Decree.  Baykeeper shall have thirty (30) days from receipt of the amended SWPPP to propose any changes to the SWPPP it believes are necessary for compliance with Paragraphs 5 through 9 of this agreement.  Within sixty (60) days of notification by Baykeeper of any proposed changes to the SWPPP, Syar shall make all of Baykeeper's reasonable changes to the amended SWPPP unless Syar timely invokes Dispute Resolution.  Compliance with the SWPPP, as amended in accordance with this paragraph, shall at all times be a requirement of this Consent Decree.

## II.     SAMPLING, MONITORING, INSPECTION & REPORTING

11.     **Sampling Program - Stormwater**:  Beginning with the 2014-2015 Wet Season, subject to the limitations set forth below, Syar shall collect and analyze stormwater samples from all of its Designated Discharge Points at the Facility according to the following sampling schedule:

a.     During each Wet Season starting with the 2014-2015 Wet Season, Syar shall collect and analyze samples from Designated Discharge Points during the first four (4) storm events of the Wet Season, as qualified in the Industrial Stormwater Permit, except that for purposes of this Consent Decree Syar can collect discharges after the first hour of discharge and samples can be collected during any storm event that is preceded by a 24-hour dry period.  If Syar is unable to take a sample from any of the Designated Discharge Points during any of the first four storm events of the Wet Season which occur during scheduled operating hours, Syar shall continue to sample from any subsequent storm events until four samples have been collected

7

from each Designated Discharge Point in that Wet Season.  In the event that Syar is

unable to collect four samples from each Designated Discharge Point in a Wet

Season, Syar shall explain in writing why it was unable to collect the required

sample(s).  If three (3) consecutive samples from a Designated Discharge Point have

constituent concentrations below the Target levels set forth in Exhibit 2 for all

parameters, Syar need not conduct additional sampling in that Wet Season from that

Designated Discharge Point.

      b.      If any new discharge points are created as a result of Syar's operations,

they shall be considered Designated Discharge Points and monitored according to the

procedure in paragraph 13(a).

      c.      Should industrial processes materially change at the Facility, Syar shall

conduct sampling for any additional toxic priority pollutants listed in 40 C.F.R. §

131.38 likely to be present in the Facility's stormwater discharges in significant

quantities as a result of the changed industrial processes.

      d.      Where Syar discharges stormwater into a storm drain inlet, catch basin, or

filtration device, Syar should endeavor to collect a sample below any insert or

treatment device.

12.    **Certified Lab**:  Syar shall have all stormwater samples collected pursuant to this

Consent Decree delivered to a California state certified environmental laboratory for analysis

within the time needed for analysis within laboratory method allowable hold times.  The

laboratory shall thereafter conduct analysis sufficient to detect individual constituents at or below

the levels set forth in the attached Exhibit 2.

13.     **Sample Result Reporting**:  After the Effective Date, Syar shall provide complete results from sampling and analysis to Baykeeper within fourteen (14) days of its receipt of the laboratory report from each sampling event.

14.     **Annual Report**:  By July 15th following each Wet Season that occurs during the Consent Decree, Syar shall send to Baykeeper a copy of the Annual Report.

15.     **Action Plan**:  If any stormwater sample result during a Wet Season exceeds any Target Level set forth in Exhibit 2, Syar shall submit an Action Plan by July 30th following that Wet Season.

16.     **Contents of Action Plan**:  If an Action Plan is required, it shall set forth:  1) the possible sources of Syar's Exceedance(s) during the applicable Wet Season, 2) revised and/or additional BMPs that are designed to reduce the level of constituent concentrations associated with the Exceedances in future storm water discharges to below the Target Levels in Exhibit 2, and 3) a schedule to implement any revised and/or additional BMPs by the earliest reasonable time, and no later than October 1 of the next Wet Season.  For the following specific discharge points, Syar will consider the additional BMPs below if an Action Plan is required following the 2014-15 Wet Season.  If Syar chooses to forego any of these options, Syar shall specify its reasons for doing so in the Action Plan.

    a.   Discharge Point A:  Install a sand filter on the existing stand pipe.

    b.   Discharge Point B:  Replace or line the existing pipe culvert and stand pipe to eliminate infiltration and maximize settling in the existing detention pond.

    c.   Discharge Point C-1:  Increase the capacity of the settling pond(s) to capture the 95th percentile storm event, install a sand filter on the existing stand pipe, and/or install a filter on the end of the pipe at the outfall point.

d.   Discharge Point D:  Increase the capacity of the settling pond to capture the 95th percentile storm event and/or install a sand filter on the exiting stand pipe.

e.   Discharge Point E:  Install a sand filter on the existing stand pipe.

f.   Discharge Point F:  Install a sand filtration device to the existing outfall structure.

17.   **Baykeeper Review of Action Plan**:  Baykeeper shall have thirty (30) days from receipt to propose revisions to the Action Plan.  Within thirty (30) days of receiving Baykeeper's revisions, Syar shall agree or disagree with the proposed revisions.  If required, a revised Action Plan will be provided to Baykeeper with explanations as to why any requested revisions were not adopted.  Any disputes regarding the revisions may be resolved per the dispute resolution provisions of this Agreement.

18.   Syar shall implement the Action Plan(s) adopted pursuant to this Consent Decree as an obligation of this Consent Decree.

19.   Within thirty (30) days after BMPs set forth in an Action Plan pursuant to this Consent Decree are implemented, Syar shall amend the Facility SWPPP to include all BMP revisions or additions not otherwise already implemented and included in the SWPPP.  Within thirty (30) days thereafter, Syar shall provide Baykeeper with a copy of such revised SWPPP.

20.   During each Wet Season, Syar is under an ongoing obligation to evaluate the BMPs implemented at the Facility and discussed in current or previous Action Plans and, if Target Levels have been exceeded, continue to attempt to reduce the concentrations to Target Levels for the remainder of the Wet Season.  Syar shall use the results from subsequent stormwater samples as they become available to assist with their ongoing evaluation of the effectiveness of BMPs.

21.   **Stipulated Payments:** Syar shall pay the following stipulated payments during the Term of this Consent Decree:

a.   One thousand dollars ($1,000) for each failure to collect a sample required under this Consent Decree during a Wet Season.

b.   In the event that Syar fails to submit to Baykeeper any document, report or other communication required in this Consent Decree by its due date, Syar shall pay a late payment of one hundred dollars ($100) per business day (Monday through Friday, excluding state and federal holidays) commencing on the third (3rd) business day after receiving Baykeeper's written notice to Syar of such failure and provided that Syar does not cure such failure by providing Baykeeper with the report, document, or communication prior to the 3rd business day after receiving notice ; and

c.   In the event that Syar fails to submit any payments due under paragraphs 21, 24, and 25 of this Consent Decree, Syar shall pay a late payment of a one hundred dollar ($100) per business day (Monday through Friday, excluding state and federal holidays) commencing on the third (3rd) business day after receiving Baykeeper's written notice to Syar of such failure and provided that Syar does not cure such failure by providing Baykeeper with such payment prior to the 3rd business day after receiving notice.

d.   Any stipulated payments described above shall be paid by September 1st of each year this Consent Decree is in effect to The Watershed Project, 1327 South 46th Street, Richmond Field Station, Richmond, CA 94804, Attn: Linda Hunter, with a copy of payment sent concurrently to Baykeeper.  Stipulated payment funds will be used by The Watershed Project to fund projects that benefit water quality in the San

11

Francisco Bay watershed.  In no case shall any of the funds be received by Baykeeper.

22.     **Site Access**:  During the Term of this Consent Decree, Syar shall permit representatives of Baykeeper to perform one (1) physical inspection per year of the Facility during operating hours ("Site Inspection").  Baykeeper shall provide Syar at least two (2) business days notice in advance of such Site Inspection, and Syar shall have the right to deny access if circumstances would make the Site Inspection unduly burdensome, pose significant interference with business operations, or unsafe.  In such case, Syar shall specify at least two (2) days within the next two (2) weeks upon which a Site Inspection may proceed during normal business hours, and the Parties shall agree upon the inspection date.  Baykeeper shall comply with all safety instructions provided to Baykeeper by Syar staff during all Site Inspections.  During Site Inspections, Baykeeper shall be allowed to inspect and sample any stormwater discharges.   If Baykeeper and/or its representatives collect samples, Syar shall be given an opportunity to collect a sample at the same location immediately following (or prior to) Baykeeper.  Results of sampling must be exchanged.  Any samples collected by either party shall be submitted to a certified California laboratory for analysis in accordance with the provisions of Section II of this Consent Decree.  Copies of the complete laboratory reports shall be provided to the other party within five (5) business days of receipt.

23.     **Reports**:  During the Term of this Consent Decree, Syar shall provide Baykeeper with a copy of all documents submitted to the Regional Water Board or the State Water Board concerning the Facility's compliance with the Industrial Stormwater Permit.  Such documents and reports shall be transmitted to Baykeeper via electronic mail, if feasible, or by U.S. Mail

when electronic transmission is not feasible, at the time the documents are due to be submitted to

the Regional Water Board or State Water Board.

### IV.    MITIGATION, FEES, AND COSTS

24.    **Reimbursement of Fees and Costs**:  Syar shall reimburse Baykeeper in the

amount of twenty four thousand five hundred twenty-two dollars ($24,522) to help defray

Baykeeper's reasonable investigation, expert, and attorneys' fees and costs, and all other

reasonable costs incurred as a result of investigating the activities at the Facility related to this

Consent Decree, bringing these matters to Syar's attention, and negotiating a resolution of this

action in the public interest.  Payment of $24,522 shall be made to Baykeeper within thirty (30)

days of the Effective Date.

25.    **Compliance Monitoring Funds:**  Syar shall reimburse Baykeeper two thousand

dollars ($2,000) per year, or up to six thousand dollars ($6,000) over the duration of this Consent

Decree, for costs and fees associated with monitoring Syar's compliance with this Consent

Decree.  If any action plan is due pursuant to Paragraph 15 of this Consent Decree, Syar shall

reimburse Baykeeper an additional $3,000 for costs and fees associated with each action plan.

Subject to the limitations of this Consent Decree, Syar shall provide such compliance monitoring

funds to Baykeeper on July 30th of each year that this Consent Decree is in effect.  Baykeeper

shall provide Syar with an invoice of its costs and fees for compliance monitoring by August

30th of each year that this Consent Decree is in effect.  Any compliance monitoring funds that

are not spent by Baykeeper shall be sent by Baykeeper to The Watershed Project, at the address

provided in Paragraph 21.d, by September 1st of each year this Consent Decree is in effect.

26.    **Dispute Resolution**: If a dispute under this Consent Decree arises, or the Parties

believe that a breach of this Consent Decree has occurred, the Parties shall schedule a meet and

confer within ten (10) business days, or such date as may be agreed upon, of receiving written notification from the other Party of a request for a meeting to determine whether a violation of this Consent Decree has occurred and to develop a mutually agreed upon plan to resolve the dispute.  If the Parties fail to meet and confer or the meet and confer does not resolve the issue, after at least seven (7) business days have passed after the meet and confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including bringing a motion before the United States District Court for the Northern District of California for the limited purpose of enforcing the terms of this Consent Decree.  The prevailing party shall be entitled to seek fees and costs incurred in any such action pursuant to this Consent Decree, notwithstanding the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provisions.

## V.      JURISDICTION OVER PARTIES AND SUBJECT MATTER OF THE CONSENT DECREE

27.    **Jurisdiction.**  For the purposes of this Consent Decree, the Parties stipulate that the United States District Court of California, Northern District of California, has jurisdiction over the Parties and subject matter of this Consent Decree.  The Parties stipulate that venue is appropriate in the Northern District of California and that Syar will not raise in the future as part of enforcement of this Consent Decree whether Baykeeper has standing to bring the Complaint, any action to enforce this Consent Decree or any motion pursuant to the Dispute Resolution procedures herein.

28.    **Jurisdiction to Enforce Consent Decree.**  This Court shall retain jurisdiction over this matter for the purpose of adjudicating all disputes among the Parties that may arise

under the provisions of this Consent Decree.  The Court shall have the power to enforce the obligations of this Consent Decree with all available legal and equitable remedies.

29.    **Submission of Consent Decree to DOJ.**   Within three (3) business days of receiving all of the Parties' signatures to this Consent Decree, Baykeeper shall submit this Consent Decree to the U.S. Department of Justice ("DOJ") and EPA for agency review consistent with 40 C.F.R. § 135.5.  The agency review period expires forty-five (45) calendar days after receipt by the DOJ, evidenced by correspondence from DOJ establishing the review period.  In the event DOJ comments negatively on the provisions of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issues raised by DOJ.

### VI.    WAIVER, RELEASES AND COVENANTS NOT TO SUE

30.    **Baykeeper Waiver and Release of Noticed Parties and Covenant Not to Sue**: Upon the Effective Date, Baykeeper, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates, and each of their successors and assigns waives, releases, and covenants not to sue Syar or its officers, directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns, or its agents, attorneys, or other representatives, on any and all claims, causes of action, demands, liabilities, losses, costs, or damages of every kind and nature, whether based on tort, contract or any other theory of recovery, arising directly or indirectly from the claims raised in the 60-Day Notice and/or the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed, or which could have been claimed, for matters included in the 60-Day Notice and/or the Complaint, and all claims raised or that could have been raised in Baykeeper's letter dated December 3, 2013, to Donald Barrella, Napa County Planning Department, re "Baykeeper Comments on the Draft Environmental Impact Report for

the Syar Napa Quarry Expansion Project," including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed, or which could have been claimed, for matters included in the DEIR Comment Letter.  Furthermore, Baykeeper, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates, and each of their successors and assigns commits not to participate in the process for permitting, entitlement, environmental review or other approval by any government or agency with jurisdiction over any aspect of Syar's Napa Quarry Expansion Project.

31.     **Syar's Waiver and Release of Baykeeper**:  Syar, on its own behalf and on behalf of its officers, directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns release Baykeeper and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns from, and waive all claims which arise from or pertain to, the 60-Day Notice and/or the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed, or which could have been claimed, for matters included in the 60-Day Notice and/or the Complaint.

**VII.     MISCELLANEOUS PROVISIONS**

32.     **Effective Date**:  The Effective Date of this Consent Decree shall be the last day for the U.S. Department of Justice to provide comment on this Consent Decree, i.e., the 45th day following the U.S. Department of Justice's receipt of the Consent Decree.

33.     **Term of Consent Decree**:  This Consent Decree shall continue in effect until September 1, 2017 (the "Term"), at which time the Consent Decree, and all obligations under it, shall automatically terminate.  The waivers, releases, and covenants contained in paragraphs 30-31, inclusive, of this Consent Decree shall survive the termination of this Consent Decree.

16

34.     **Execution in Counterparts**:  The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

35.     **Signatures**:  The Parties' signatures to this Consent Decree transmitted by facsimile or electronic mail transmission shall be deemed binding.

36.     **Construction**:  The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

37.     **Authority to Sign**:  The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

38.     **Integrated Consent Decree**:  All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein.

39.     **Severability**:  In the event that any of the provisions of this Consent Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

40.     **Choice of Law**:  This Consent Decree shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

41.     **Full Settlement**:  This Consent Decree constitutes a full and final settlement of this matter.

42. **Negotiated Agreement**:  The Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

43. **Modification of the Agreement**:  This Consent Decree, and any provisions herein, may not be changed, waived, or discharged unless by a written instrument signed by the Parties.

44. **Assignment**:  Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties, and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties, and their successors and assigns.

45. **Mailing of Documents to Baykeeper/Notices/Correspondence**:  Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Baykeeper pursuant to this Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail addresses listed below or, if electronic mail transmission is not feasible, via certified U.S. Mail with return receipt, or by hand delivery to the following address:

Baykeeper:

George Torgun
San Francisco Baykeeper
785 Market Street, Suite 850
San Francisco, CA 94103
E-mail: george@baykeeper.org

Unless requested otherwise by Syar, any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Syar pursuant to this Consent Decree shall, to the extent feasible, be provided by electronic mail transmission to the e-mail

addresses listed below, or, if electronic mail transmission is not feasible, by certified U.S. Mail

with return receipt, or by hand delivery to the addresses below:

Syar:

| | |
|---|---|
| Toby Goyette | Michael D. Corrigan |
| Environmental Manager | Assistant General Counsel |
| Syar Industries, Inc. | Syar Industries, Inc. |
| 2301 Napa-Vallejo Highway | 2301 Napa-Vallejo Highway |
| P.O. Box 2540 | P.O. Box 2540 |
| Napa, CA  94558 | Napa, CA  94558 |
| tgoyette@syar.com | mcorrigan@syar.com |

with copies to:

Chris Carr
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105-2482
E-mail: ccarr@mofo.com

Notifications of communications shall be deemed submitted on the date that they are

emailed, or postmarked and sent by first-class mail or deposited with an overnight mail/delivery

service.  Any changes of address or addressees shall be communicated in the manner described

above for giving notices.

46.    **Impossibility of Performance**:  No Party shall be considered to be in default in

the performance of any of its obligations under this Consent Decree when performance becomes

impossible, despite the timely good faith efforts of the Party, due to circumstances beyond the

Party's control, including without limitation, any act of God, act of war or terrorism, fire,

earthquake, flood, and restraint by court order or public authority.  "Circumstances beyond the

Party's control" shall not include normal inclement weather, economic hardship or inability to

pay.  Any Party seeking to rely upon this paragraph shall have the burden of establishing that it

could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the impossibility of performance.

47.     If for any reason the DOJ or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the DOJ or the District Court.  If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the DOJ or District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

AGREED:

SAN FRANCISCO BAYKEEPER

     Date:  October 29, 2014

     *George Torgun*

_____
George Torgun
Managing Attorney, San Francisco Baykeeper


SYAR INDUSTRIES, INC.

     Date:

_____
Michael D. Corrigan
Assistant General Counsel
Syar Industries, Inc.

APPROVED AS TO FORM:


Chris Carr
Attorney for Syar Industries, Inc.

APPROVED AND SO ORDERED, this 12th day of January 2015_____.

UNITED STATES DISTRICT JUDGE



**EXHIBIT 1**

# MEMORANDUM

From:        Ian Wren, CPSWQ, QSD/QSP

Date:        March 6, 2014

Subject:     Recommendations for conceptual best management practices at the Syar Industries, Inc.
             facility, Napa, CA

---

This memorandum serves to summarize observations made during a site visit on February 14, 2014 to the Syar Industries, Inc. facility in Napa, CA and to provide conceptual recommendations for stormwater best management practices (BMPs). Final BMP selection and design specifications should be the subject of further discussion.

## INTRODUCTION

Syar Industries, Inc. operates a rock quarry, aggregate processing facilities, and maintains industrial equipment at their Napa, CA site (Facility). The entire site covers 745.5 acres, located immediately east of a tidally-influenced section of the Napa River, approximately 2-miles south of central Napa. Maps and descriptions of operation areas are contained in the most recent stormwater pollution prevention plan (SWPPP) for the Facility dated July 2009. A site map dated November 2012, provided by Syar Industries, is attached to this memorandum as Appendix 1, SWPPP Site Map.

As a permittee under National Pollution Discharge Elimination System (NPDES) General Permit No CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ (Industrial Stormwater Permit), the Syar Facility has self-reported stormwater quality data from a total of seven (7) monitoring stations (A, B, C-1, C-2, D, E, and F). On a consistent basis, exceedances of U.S. Environmental Protection Agency (EPA) benchmarks for stormwater quality have been recorded from each monitoring station. Parameters for which exceedances have been recorded include total suspended solids (TSS), aluminum, iron, nitrate + nitrite nitrogen, copper, zinc, and lead.

On February 14, 2014, Baykeeper staff was escorted through portions of the Facility by representatives from Syar Industries. This tour focused on inspections of the seven designated monitoring outfalls, identified as outfalls A-F. Outfalls A through E discharge to Arroyo Creek, a tributary to Napa River, while outfall F discharges to an unnamed channel leading to Napa River. Over the course of the tour, discussions were held regarding opportunities and constraints associated with monitoring and installation of structural BMPs at the Facility.

FINDINGS AND RECOMMENDATIONS

Based on review of stormwater quality data and an on-site inspection, benchmark exceedances are primarily associated with land disturbing activities, typical of a mining setting, as well as the storage of industrial machinery and scrap metal in an open-air setting. Pollutants are transported via aerial deposition, automobile tracking, mechanical operations and stormwater mobilization. Principal stormwater BMPs found on-site include straw wattles, sediment retention ponds, and street sweeping. The Facility SWPPP lists a number of additional BMPs to address management of hazardous materials and mining activities. At most monitoring locations, benchmark exceedances of heavy metals coincide with elevated TSS values, indicating pollutants of concern are sediment-bound and subject to BMPs designed to filter or settle out suspended sediment loads.

Recommendations are separated by discharge point and include source containment, good housekeeping and treatment BMPs intended to reduce the concentration of stormwater-borne pollutants. Specifications for conceptual recommendations made here may be provided upon request.

*Monitoring Point A*

Self-reported monitoring data from monitoring point A include elevated heavy metals, coinciding with high suspended sediment loads. As the time of the February 14 site visit, discharges were not observed from the monitoring station (Appendix 2, Figures 1-2). Up-gradient detention ponds connected to this outfall, however, were characterized by very high suspended solids. Similar to the other observed discharge points at the Facility, the settling ponds maintain stand pipes to ensure discharge during large storm events that may threaten to overtop the ponds. The access road to the ponds exhibited signs of high erosion, where bedrock was exposed along the unvegetated access point. Check dams were observed along the access road and between the three ponds in series. To address erosion and enhance the settling capacity of the ponds the following is recommended:

- Increase the capacity of the two (2) upstream ponds to permit greater settling of runoff prior to reaching the third terminal pond.
- Install stand pipes between the ponds, rather than the current design which permits overtopping from one to the other, to minimize erosion and enhance settling time.
- Either fill and revegetate the access path leading to the settling ponds (Figure 2) or install a greater number of gravel check dams, at approximately 30 foot intervals.
- Improve sediment management activities within the catchment area, through enhanced use of wattles, revegetation, and check dams.
- Installation of a sand filter device associated with the stand pipe. This should be implemented following the other BMPs listed above to determine if necessary, based on subsequent sampling results.

*Monitoring Point B*

Discharges at monitoring point B have periodically shown elevated TSS concentrations, though typically, discharges are showing high heavy metals and moderate TSS concentrations. At the time of inspection, discharges appeared cloudy, though not heavily laden with sediment (Figure 3), suggesting filtration methods may be required to remove fine sediments and metals. This discharge point poses challenges, in terms of the apparent age of the discharge pipe, which has rusted through at the outfall, and the upstream detention pond, which appears decades old and located within a small ravine (Figure 4). Further, the detention pond was not overtopping, though a small rate of flow was discharging from the pipe, suggesting below-ground infiltration into the aging pipe. Based on conversations on-site, this pond serves little service at this time, which may warrant removal of the pond and restoration of the stream and pipe culvert. Possible options include:

- Assuming the settling pond is not necessary, the rock and sheet metal dam could be removed, coupled with replacement of the culvert and restoration of the creek.
- Replacement or lining of the existing pipe culvert, as well as replacement of the stand pipe, to effectively eliminate infiltration and maximize settling in the existing detention pond. This is likely the most effective and least costly option which could minimize the need for filtration.
- Removal of unused scrap metal and trash observed in the vicinity of the monitoring point and along the creek (Figure 5).
- Installation of an end-of-pipe filtration system. Not recommended given storage requirements and the potential to increase flood risk.

*Monitoring Point C-1*

Self-reported data from monitoring point C-1 includes elevated readings for TSS and heavy metals, with concentrations of TSS, aluminum, and iron reaching as high as 712 mg/L, 27 mg/L, and 58 mg/L, respectively. Such results are likely associated with significant storm events resulting in discharge from the stand pipe following short settling times. The settling pond area, shown in Figure 6, is equipped with a pump, leading to filter bags (Figure 7). It is unclear how effective these bags are at removing heavy metals, though some removal is most likely achieved, in contrast to discharges from the stand pipe. To achieve greater removal the following options should be explored:

- Increase the capacity of the settling pond to capture the 95th percentile storm event.
- Install sand filter at the stand pipe or other end of pipe filter at the outfall point.
- Route all discharges through the existing bag filters and establish an alternate monitoring point for the C-1 discharge point.

*Monitoring Point C-2*

Syar representatives indicated flows from monitoring point C-2 are associated primarily with natural spring discharges, though the catchment area associated with this point was not fully investigated during the February 14 site visit (Figure 8). Self-reported data, however, suggests industrial operations are impacting water quality from this site, with TSS values reaching as high as 750 mg/L and iron and

aluminum as high as 66 mg/L and 28 mg/L, respectively. Benchmark exceedances of TSS, heavy metals, and nitrogen have routinely been recorded from this station.

Since potential upstream contributions were not observed, it is recommended that Syar conduct a full investigation of the catchment area and identify industrial contributions, perhaps in the form of exposed slopes, vehicle tracking, or other erodible areas that could be revegetated or otherwise mitigated. Following completion of this exercise, discussions of BMPs or factors that could contribute to these results should take place.

### Monitoring Point D

Monitoring point D is associated with a detention pond equipped with a stand pipe (Figures 9-10). Prior to 2010, benchmark exceedances of TSS were accompanied by those of heavy metals, yet in recent years TSS concentrations have been reduced. Elevated results for iron and aluminum remain but they seem to have been reduced significantly, perhaps through enhanced street sweeping and management of the berms located upstream of the settling pond. Significant structural improvements are not recommended at this time though the following are recommended to reduce heavy metals further:

- Install filter sock or bag at the outfall/monitoring station.
- Install additional filtration berms and wattles upstream and adjacent to the settling pond.

Should these low-cost approaches prove ineffective, the settling pond could be expanded to provide additional storage or a sand filtration device could be installed in-line with the existing stand pipe. Any sand filters installed at the Facility should be designed according to specifications for intermittent sand filters, which call for specific effective particle size, wastewater loading rates and maintenance regimes.[1,2] Materials readily available on-site could be used, i.e., mixtures of aggregate and sand to achieve the greatest treatment efficiency. Addition of compost will likely facilitate sorption of dissolved metals at greater rates than would be expected from sand alone. Any media mixture will require periodic replacement, as sand filters are known to decline in treatment performance over time.[3]

### Monitoring Point E

Monitoring point E is connected to a stand pipe at the perimeter of a large settling pond at the southeast portion of the Facility (Figures 11 and 12). A small rate of flow was associated with this discharge point at the time of inspection, suggesting infiltration of groundwater or seepage from the settling pond. Monitoring data from this point does not suggest TSS is found at high concentrations, though it is clear that during large storm events, which had occurred the week prior to the site inspection, discharges from the stand pipe do occur. Given the highly turbid nature of the settling pond

---

[1] Minton, G. 2002. *Stormwater Treatment: Biological, Chemical and Engineering Principles*. Resource Planning Associates.

[2] Washington State Department of Health, Wastewater Management Program. 2002. Rule Development Committee Issue Research Report: Draft Sand/Media Specifications. Available at http://www.doh.wa.gov

[3] California Department of Transportation (Caltrans). 2004. *BMP retrofit pilot program, Final report, CTSW-RT-01-050*. Available at http://www.dot.ca.gov

this suggests large suspended sediment loads are discharged during such events. Though such events are likely infrequent, it is recommended that additional measures be taken to reduce sediment loads to Arroyo Creek, which will likely result in reductions in recorded concentrations of heavy metals and nitrogen:

- Installation of a sand filter or equivalent device at the location of the stand pipe.
- Lining of existing pipe and/or replacement of stand pipe to effectively eliminate infiltration into the existing pipe, to encourage natural attenuation of heavy metals and nitrogen prior to lateral transport towards Arroyo Creek.
- Improve erosion control along the slopes adjacent to the settling pond through higher density of wattles along the slope, along with or erosion control mats, hydroseeding, or greater amounts of hay applied to the slopes.
- Implementation of check dams or additional settling basins upstream of the existing pond.

***Monitoring Point F***

The drainage area for monitoring point F is characterized as an industrial equipment storage area (Figures 13-15). Self-reported data from monitoring point F includes benchmark exceedances for TSS, nitrogen, aluminum, copper, iron, zinc, and lead. To reduce particulate-based pollutants from discharging at this point, a gravel field has recently been laid in the vicinity of the outfall point, in effort to slow the flow of overland runoff and filter sediment. Prior to the end of the 2013/2014 wet weather season, sufficient water quality data should be available from this point to determine the effectiveness of this approach.

In the event elevated heavy metals are still recorded from this point, pollutants from this area are likely in dissolved form or associated with fine sediments, thus requiring additional preventative measures and/or filtration-based BMPs. To the extent possible, all abandoned, rusted or broken equipment, scrap metal, or other equipment no longer considered for future use that have the potential to serve as the source for pollutant loading, should be stored under cover or removed from the site. It may also be necessary to amend the existing outfall structure to serve as a sand filtration device or be combined with another filtration device.

## Appendix 2: Site Photos



**Figure 1. Discharge point A. Not flowing at the time of inspection**



**Figure 2. Access road to settling ponds upstream of monitoring point A showing signs of erosion**



**Figure 3. Discharge point at monitoring station B showing turbid discharges**



Figure 4. Detention pond upstream of monitoring point B



**Figure 5. Scrap metal and trash located in the vicinity of monitoring point B**



Figure 6. West facing view of detention pond associated with monitoring point C-1



Figure 7. Filter bags adjacent to monitoring point C-1; providing filtration when excess stormwater is pumped from detention pond



**Figure 8. Monitoring point C-2**



Figure 9. Detention pond and stand pipe upstream of monitoring point D



Figure 10. Monitoring point D



**Figure 11. Northeast facing view of detention pond adjacent to monitoring point E. Stand pipe located on the southern edge of the pond**



Figure 12. Monitoring point E



Figure 13. East-facing view of gravel field recently placed adjacent to monitoring point F



Figure 14. Monitoring point F

19



Figure 15. East-facing view of industrial storage area adjacent to monitoring point F

# EXHIBIT 2

**Target Levels for Stormwater Sampling**

| Constituent | Target Levels | Source |
|---|---|---|
| **pH** | 6.0 – 9.0 SU | *Multi-Sector General Permit 2000 benchmark* |
| **Nitrate + Nitrite Nitrogen** | 0.68 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |
| **Total Suspended Solids** | 100 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |
| **Oil and Grease** | 15 mg/L | *Multi-Sector General Permit 2000 benchmark* |
| **Chemical Oxygen Demand** | 120 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |
| **Total Aluminum** | 0.75 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |
| **Total Copper*** | 0.0156 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |
| **Total Iron** | 1.0 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |
| **Total Zinc*** | 0.13 mg/L | *Multi-Sector General Permit 2008 Sector-specific benchmark* |

*These parameters are included in the 2008 Multi-Sector General Permit, but are hardness dependent. Hardness calculations are appropriate for discharges to freshwater (*see* http://water.epa.gov/scitech/swguidance/standards/current/index.cfm#appendxb; http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/planningtmdls/basinplan/web/bp_ch3.shtml); hardness values are based on an assumed hardness of 100-125 mg/L.